IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL ACTION NO. |
| | ) | 2:10-cr-15-WKW |
| ANTHONY PERRI TURNER | ) | [wo] |
| | ) | |

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

Pending before the Court is Defendant's *Motion to Suppress and Memorandum in Support . . .* (Doc. 57, filed 6/16/10). Defendant Anthony Turner ("Turner" or "Defendant") seeks (1) suppression of identification evidence, and (2) an order precluding testimony regarding witness confidence with respect to any identification evidence deemed admissible at trial. After an evidentiary hearing and due consideration of briefs, arguments, exhibits, and applicable law, the Magistrate Judge recommends that the District Court **DENY** the motion to suppress.

**I.  FINDINGS OF FACT**

On October 26, 2009, in the middle of the night, three men broke into a trailer in Troy, Alabama to commit a robbery. Six people – two females and four males – lived in the trailer. Five of the occupants were non-citizen Hispanics with little-to-no familiarity with the English language. The occupants were awakened from their beds and instructed not to look at the intruders while they were corralled into a closet. At least two of the intruders aimed firearms at the occupants. The intruders demanded money from the group and when they were told there was none, two of the males were pistol-whipped and

1

a third was kicked in the head.  Two women, D.G. and A.P., were forced to perform oral sex on two of the assailants, and the two then proceeded to rape D.G..  Throughout the sexual assault, the third assailant held the women at gunpoint and did not participate in the assaults on the women.  Afterward, the women were made to shower and then return to the closet.  The three assailants demanded that all of the occupants turn over their car keys, and they drove off in a Chevrolet Cavalier that belonged to one of the victims.  The car was abandoned and recovered by law enforcement.

The victims reported the break-in and assaults to law the Troy Police Department.  D.G. and A.P. viewed a long series of random mug shots shown to them by police officers.  D.G. identified Ronald Thomas as one of the assailants.[1]

Detective Michael Hughes of the Troy Police Department queried a local database for known associates of Ronald Thomas.  The database identified Kendrick Thomas, his brother, and Joseph McClendon.  Hughes then used photos of Kendrick Thomas and McClendon to create two photographic line-ups with the Law Enforcement Tactical System (LETS).  LETS is a computer database which automatically generates photo line-ups based on the physical criteria of a suspect's photo.  Hughes explained that LETS automatically selects photographs of persons of the same race and gender, and within a set margin of weight, height, and age in relation to the initial photo.  Hughes viewed the LETS-selected photographs and eliminated those with identifying features or characteristics that were different from Thomas's, such as skin tone, facial hair, earrings,

---

[1] Though the Government's *Response to Defendant's Motion to Suppress* (Doc. 69, at 2) states that D.G. identified Kendrick Thomas while viewing mug shots, the Assistant United States Attorney clarified that the mug shot of Ronald Thomas was picked by D.G.  The photograph of Kendrick Thomas was later picked from a photo line-up.

birth marks, etc. Hughes said he tried to create a line-up that was fair and did not highlight any particular features of one individual over the other.

Photo line-up #1 contained a photograph of Kendrick Thomas and photo line-up #2 contained a photograph of Joseph McClendon. D.G. picked Kendrick Thomas from photo line-up #1. McClendon's photo was not identified from the second line-up. Warrants were issued for the arrest of the Thomas brothers. Hughes interviewed Ronald Thomas after Thomas consented to waive his right to remain silent. Ronald Thomas told Hughes that Anthony Turner was involved in the crime with him and his brother. Using this information, Hughes secured a warrant for Turner's arrest. Turner denied involvement in the crime, and during his interview gave a letter to Hughes which stated he was someplace else at the time of the incident.

Turner's picture was used in a photo line-up created through LETS. On October 27, 2009, A.P. was brought to the police station to view the new photo line-up. Before she was shown the line-up, Hughes gave her a form which explains to crime victims that they should not conclude or guess that the photographs contain the picture of the person who committed the crime and that they are not obligated to identify anyone. A.P. signed the form and proceeded to view the photographs. Hughes identified a separate form with lines numbered one through six – each corresponding to a photograph in the line-up. As he and A.P. went through the photographs, Hughes wrote on each line "yes" or "no," according to whether A.P. identified a photograph. Hughes explained that when A.P. was viewing the line-up, she asked for a piece of paper, which he gave her. Hughes explained that A.P. told him one of the assailants' faces was partially covered with a bandana.

After placing the paper over the lower portion of Turner's photo, A.P. positively identified him as one of the intruders. Hughes did not make any comment when A.P. selected Turner's photo, but looked at his partner and nodded.

A.P. testified that she was sleeping when three black men entered the trailer where she lived. She and the five other occupants were forced into the closet, then she and her friend were taken out and forced to undress before the other woman was raped and A.P. was sexually assaulted. After reporting the crime, A.P. described the assailants' attire to police officers. She said the third man was about 5'9," 180 pounds, medium complexion, and wore a bandana on his face. A.P. said she had a quick look at the third man's eyes when they had a gun pointed at her head and the assailants were talking to each other. She explained that she did not hear their voices, and was closest to the third man when she was told to walk past him in the kitchen of the trailer.

A.P. said that she remembered the third man's eyes because of the "way they were shaped and the way he was looking whenever I looked at him." She made this observation at a distance of between five and ten feet, in low, but sufficient light to see his eyes. She explained that her view of the third man's eyes only lasted about two seconds because they were told not to look at the assailants or they would be shot in the head. A.P. also acknowledged telling Hughes that she really could not see the third man. She recounted her identification of the third man by using a piece of paper to cover the lower portion of the photograph. She said she clearly remembered the eyes of the man wearing the bandana and had no doubt that it was him. A.P. noticed the officers

4

communicating with each other after she identified the photograph, but she did not interpret their communication as confirmation that she picked the correct photo.

On February 24, 2010, the Grand Jury for the Middle District of Alabama returned a three-count indictment against Turner and the Thomas brothers. Doc. 1. The indictment charges the three with (1) conspiracy to take a motor vehicle by force and intimidation, with intent to cause death and serious bodily harm, in violation of 18 U.S.C. §§ 2119 and 371; (2) aiding and abetting each other to take a motor vehicle by force and intimidation, with intent to cause death and serious bodily harm, in violation of 28 U.S.C. §§ 2119 and 2; and (3) aiding and abetting each other to knowingly use and carry firearms during and in relation to, and possession of said firearms in furtherance of, a crime of violence for which they may be prosecuted in a Court of the United States, to wit: "carjacking," as charged in Count 2, all in violation of 18 U.S.C. §§ 924(c)(1)(A) and 2.

Turner's motion to suppress alleges A.P.'s selection of his photograph is tainted because it arose from an overly suggestive and prejudicial procedure. He argues the evidence should not be offered, but if it is admitted, then all testimony regarding witness confidence should be precluded at trial. The Court heard argument and took evidence from the parties on July 15, 2010.

## II. DISCUSSION AND ANALYSIS

Turner argues that he is the only one in the photo array who has a dark complexion and the other five photos depict black men with light complexions. He argues this singularity made him instantly identifiable given A.P.'s recollection that the third

assailant was "dark or medium."  Doc. 57, at 2-3.  The admission of a witness's photo-identification of a suspect violates a defendant's constitutional right to due process if "the photographic identification was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."  *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971 (1968).  The Eleventh Circuit instructs that courts must first decide whether the original identification procedure was unduly suggestive, and if so, determine whether, under the totality of the circumstances, the identification was nonetheless reliable.  *Cikora v. Dugger*, 840 F.2d 893, 895 (11th Cir. 1988).

The Court is aided in the first step by its ability to view the photographic line-up from which A.P. selected Turner's picture.  Doc. 69-1(black/white); Govt. Ex. #1(color).  The photographs are all of clean shaven black males of the same approximate age and complexion.  The very small variances in skin tone are easily attributable to photographic quality.[2]  Indeed, the persons depicted look quite similar to each other.  Turner's allegation that his photograph is the only one in the line-up with a darker complexion is not borne out by the Court's inspection.  Indeed, the array does not strike the Court as one that suggests one photo is more likely to be chosen over any other.  Even so, "[A] lineup is not unduly suggestive merely because the defendant's photograph can be distinguished from the others."  *United States v. Smith*, 148 Fed. Appx. 867, 874 (11th Cir. 2005), citing *Cikora,*, 840 F.2d at 896-97.

The Government cites several cases which address some of the issues of similarity/dissimilarity in photo arrays of black male suspects.  Doc. 69, at 4-5.  The

---

[2] Hughes testified that he chose one of the random pictures selected by LETS because the person depicted has a pointed head, much like Turner's.

6

Court summarizes the facts of this case by borrowing from *United States v. Walker*, 199 Fed.Appx. 884, 887 (11th Cir. 2006), wherein the Eleventh Circuit dismissed a challenge to a photographic line-up by finding "no evidence that officers directed the victim's attention to [defendant's] photograph, and, although there are some differences between each photo, nothing unreasonably suggested that [defendant] was the actual suspect in the offense."

Despite the unprejudicial nature of the line-up, the Court is mindful that other methods of suggestion must be considered. In this inquiry, testimony shows that A.P. was given a form which said she should not conclude or guess that the perpetrator was actually in the line-up. Hughes acknowledges that he nodded to his partner *after* Turner was identified, and A.P. did notice their communication. The events surrounding the identification do not trouble the Court because the exchange occurred *after* A.P. used the paper to improvise a bandana and select Turner's picture. The Court therefore finds that neither the photo line-up, nor the circumstances surrounding it, were unduly suggestive. Even though the first prong of the Simmons test is resolved in the negative, the Court finds further that A.P.'s identification of Turner's picture is reliable, given the totality of the circumstances. Among the facts which lead the Court to this conclusion are that the photo identification took place the day after the assault, A.P. took steps to recreate the look of a bandana so that she could focus on Turner's eyes, and her view of the third assailant from a distance of less than ten feet. Having so found, the motion to suppress A.P.'s identification of Turner is due to be denied.

Turner urges the Court, through his *Motion* and argument at hearing, to limit A.P.'s testimony at trial concerning her strong conviction that she correctly identified Turner. He cites the limited time she had to view him, the fact that she was sexually assaulted, the reliability of her identification given the lighting in the trailer, and the distraction of a gun pointed at her head through the entire crime. As noted at the conclusion of the hearing, these matters are for the trial court to decide. *See also Smith, id*. at 873-74 (discussing jury charge of the accuracy of eyewitness identification where weapon is trained on the witness.).

The photo line-up presented to A.P. by the Troy Police Department did not violate Turner's due process rights, as it did not unduly suggest that Turner was one of three men who invaded her home, committed sexual assault, and took a motor vehicle by force and intimidation. Accordingly, the motion to suppress is due to be denied. Turner's request for further relief concerning the treatment of A.P.'s possible testimony at trial cannot be addressed by the undersigned, but is a matter reserved for the trial court.

### III.  CONCLUSION

Pursuant to the foregoing findings and conclusions, it is the **RECOMMENDATION** of the Magistrate Judge that Defendant's *Motion to Suppress* (Doc. 57) be **DENIED**.

It is further **ORDERED** that the parties shall file any objections to the said Recommendation not later than **August 17, 2010.** Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive or general objections will not be considered by the

District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); *see Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

DONE this 4th day of August, 2010.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE